STATE OF WEST VIRGINIA

*v.*

JIM BOYD

(No. 13727)

Decided March 29, 1977.

*Wade H. Ballard, III, John R. Frazier* for Boyd.

*Chauncey H. Browning*, Attorney General, *Betty L. Caplan*, Assistant Attorney General, for the State.

MILLER, JUSTICE:

In this appeal from a first degree murder conviction in the Circuit Court of Mercer County, we consider assignments of error as to the use of defendant's silence for impeachment, the alleged prejudicial conduct of the prosecutor, and the absence of the accused during a hearing at trial. We reverse the conviction on each of these grounds.

On December 1, 1972, the defendant, Jim Boyd, shot and killed James Baldwin while Baldwin was seated in his car in Matoaka, West Virginia, with his nephew, Sammy Rutledge. Rutledge was also shot and was seriously wounded in the same incident. It appears that earlier in the day Boyd, Baldwin and Rutledge had an argument and this encounter was its fatal culmination. Baldwin was shot twice at close range by Boyd.

A companion of Boyd at the time of the shooting, Earl Cline, testified that Boyd had a pistol with him while they sat in Boyd's parked car and had the gun in hand when the car with Baldwin and Rutledge stopped beside them.

After the shooting Boyd drove to Princeton where he turned himself in at the jail, admitted the shooting and

stated that he had thrown the gun away near Black Oak Road. The gun was never found. This was the extent of the information volunteered by Boyd. Shortly afterwards his attorney was contacted and appeared at the jail.

At the trial, the defendant testified that after the shooting he threw the gun from his car near the Hollywood Service Station, a different location than Black Oak Road. The defendant Boyd also asserted that he acted in self-defense in the shooting since he thought Baldwin had a gun and was coming after him.

The prosecutor, on cross-examination, sought to impeach the defendant by asking him why he had not disclosed his self-defense story to the police at the jail.[1] This was objected to by defense counsel. The court overruled the objection, but did advise the jury that the defendant at the time of his arrest was not required to make any pre-trial statement if he did not elect to do so. The defendant responded with the statement: "That is what they told me down there" (apparently meaning at the jail). Whereupon, the prosecutor proceeded to comment on the defendant's election to remain silent at the jail.[2]

The defendant urges that the foregoing cross-examination violated his privilege against self-incrimination. It is defendant's theory that, as a part of his constitutional privilege against self-incrimination, the State can neither impeach him by his pre-trial silence nor require him to justify such silence.

---

[1] "Q. Why, Mr. Boyd, if you had already told the police, like you said you had 'Cotton' Earnest, Deputy Sheriff of Mercer County, and told him these boys were trying to kill you and say to the jury, 'I had to kill the man because he had a gun in his hand,' why did you not tell that to the police when he gave you the opportunity immediately after it happened to make a statement about what happened?"

[2] "Q. They told you that, and you didn't want to? A. The man downstairs told me that. He said, 'Anything you say can be or will be held against you,' I believe is the way he said it. Q. So you chose not to make a statement--- A. I told him--- Q. And had them contact your attorney."

Before discussing this aspect of the constitutional right against self-incrimination, it may be appropriate to briefly summarize the status of our law on this subject.

This Court has recognized that Article III, Section 5 of the *West Virginia Constitution* provides the constitutional right to remain silent. *State v. Fortner*, 150 W. Va. 571, 148 S.E.2d 669 (1966). Similar language is, of course, to be found in the 5th Amendment to the United States Constitution.

*Fortner* also reaffirmed that in determining the admissibility of a confession, the court is required, whether requested or not, to hold a hearing out of the presence of the jury to take evidence to determine its voluntariness.[3]

Although *Fortner* did not hold that a right to a hearing out of the jury's presence was a constitutional right, this was later established in *State v. Starr*, ____ W. Va. ____, 216 S.E.2d 242 (1975).[4] The Court in *Starr* did not identify the provision of the West Virginia Constitution on which it based its holding, but we conclude that the mandatory duty to hold any voluntariness hearing out of the presence of the jury is grounded in the Due Process Clause of the *West Virginia Constitution*, Article III, Section 10.

The *Fortner* decision preceded by one week *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), which dealt exhaustively with a defendant's 5th Amendment right to remain silent as it relates to pretrial confessions. *Miranda* also made clear that the right to assistance of counsel embodied in the 6th Amendment

---

[3] It is, of course, recognized that after the court initially determines its voluntariness, the confession can then be given to the jury, which has the ultimate resolution of the weight and credibility to be given to it after hearing all of the relevant evidence surrounding its creation. *State v. Plantz*, 155 W. Va. 24, 180 S.E.2d 614 (1971).

[4] *Starr* also clarified the level of proof required of the State to sustain the voluntariness of a confession, holding that the State must prove by a preponderance of the evidence that a confession or admission was voluntarily given.

extends to those proceedings where defendant's 5th Amendment rights may be imperiled.

This latter constitutional point was not discussed in *Fortner*, but was decided in *State v. Plantz*, 155 W. Va. 24, 180 S.E.2d 614 (1971). Again, in *Plantz*, the Court made no reference to a particular constitutional provision of either this State or the United States, but did cite *Miranda v. Arizona*, *supra*.

It perhaps may be useful to quote from that portion of *State v. Plantz*, 155 W. Va. at 38, 180 S.E.2d at 623, that quoted from and applied the holding of *Miranda*, which we determine to have also been based upon Article III, Section 5 of the *West Virginia Constitution:*

> " 'To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.' " 384 U.S. at 478-79.

With this background we turn to the question of whether defendant Boyd's constitutional right to remain silent, under Article III, Section 5 of the West Virginia Constitution, was infringed when he was required to answer why he did not divulge his self-defense story at the time he was in custody and after he had elected to remain silent.[5]

The United States Supreme Court in *Doyle v. Ohio*, ____ U.S. ____, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), held that the constitutional right to remain silent carries with it the principle that a defendant cannot be impeached at trial by his pre-trial silence. In *Doyle*, the defendant took the stand and was subsequently cross-examined on why he had not told the same story to the arresting officers. The defendant did not seek to explain his pre-trial silence as a reliance on his Miranda warning, as did the defendant Boyd. However, the Supreme Court concluded that it was unnecessary to show reliance on Miranda warnings to preclude impeachment of the defendant on his pre-trial silence.

The holding of *Doyle* was based on two grounds. First, because it is constitutionally mandated that a person be advised immediately upon being taken into custody that he has the right to remain silent, the warning itself can create the act of silence. It would, therefore, be unfair to permit the State to obtain an advantage of being able to utilize the silence to impeach the defendant.

The second reason is that one of the purposes of a Miranda warning is to assure the defendant that if he

---

[5] We note that *Miranda* recognized that a defendant in custody can volunteer information after receiving his initial constitutional warning, and at a later time invoke the privilege against self-incrimination on other questions, at which point the interrogation must cease. The initial volunteered statements do not act as a waiver of the right to claim the privilege as to subsequent questions. 384 U.S. at 475-76. We are in accord with this rule as being a part of the privilege embodied in Article III, Section 5 of our Constitution, and conclude that the defendant's initial spontaneous statements that he did the shooting and threw the gun away did not operate to waive his right to remain silent as to the rest of the details of the crime, including his defenses to it.

asserts his privilege to remain silent no harmful consequences will flow from such assertion. Therefore, it would be wrong to permit the State to attack the defendant over his pre-trial silence.

It has long been the statutory policy of this State to prohibit the State from making any comment on the defendant's failure to testify at trial. W. Va. Code, 57-3-6. This right to silence at trial has been zealously guarded by this Court and is recognized to be linked to the right against self-incrimination found in Article III, Section 5 of the *West Virginia Constitution. See, Pinkerton v. Farr,* ___ W. Va. ___, 220 S.E.2d 682 (1975); *Smith v. Oakley,* ___ W. Va. ___, 220 S.E.2d 689 (1975); *State v. Ramey,* ___ W. Va. ___, 212 S.E.2d 737 (1975).

One of the most cogent arguments prohibiting the State's use of the defendant's silence against him is to be found in *State v. Taylor,* 57 W. Va. 228, 235, 50 S.E. 247, 249 (1905), where this Court stated:

> "So the law, having brought the prisoner into court against his will, *did not permit his silence to be treated or used as evidence against him.*" [Italics added]

The basis for the rule prohibiting the use of the defendant's silence against him is that it runs counter to the presumption of innocence that follows the defendant throughout the trial. It is this presumption of innocence which blocks any attempt of the State to infer from the silence of the defendant that such silence is motivated by guilt rather than the innocence which the law presumes. *Pinkerton v. Farr, supra,* articulates this point and holds that under our law the presumption of innocence is an integral part of criminal due process and that such presumption is itself a constitutional guarantee embodied in Article III, Section 10 of the West Virginia Constitution.

We, therefore, hold that under Article III, Sections 5 and 10 of the *West Virginia Constitution,* it is reversible error for a trial court to permit cross-examination of a

defendant as to his pre-trial silence. The constitutional right to remain silent also compels the State to remain silent about such silence.

This does not mean that a defendant cannot be confronted by voluntary pre-trial statements which are inconsistent with his trial testimony. We are not unmindful that a prosecutor should not be unduly hampered in his right to cross-examine the defendant. There are, however, limitations on such rights. Thus, in *State v. McGee,* ___ W. Va. ___, 230 S.E.2d 832 (1976), it was held that impeachment through prior offenses is subject to a balancing test wherein the trial court must determine if the danger of undue prejudice outweighs the probative value of the evidence, and if it does, the evidence should not be admitted. *State v. Ramey, supra,* reviews some of the rules relating to restrictions on the right to impeach the defendant on collateral matters. *State v. Thomas,* ___ W. Va. ___, 203 S.E.2d 445 (1974), sets standards governing the right to cross-examine the defendant on crimes related to the one for which he is being tried.

We conclude that although the State may impeach a defendant on pre-trial statements inconsistent with his trial testimony, before such impeachment can be undertaken the trial court is required, out of the presence of the jury, to determine if such statements were voluntary in the *Miranda* sense. Furthermore, where, as here, there are substantial areas of relevant facts about which the defendant did not make pre-trial statements, the trial court must be careful to insure that the State does not in its impeachment efforts compel the defendant to acknowledge or justify his pre-trial silence in those areas. Impeachment cannot cross into constitutionally prohibited territory.

The second assignment of error centers on some thirty-six incidents of alleged prejudicial and inflammatory remarks made by the prosecutor during the course of the trial. It would serve no useful purpose to list in detail each of the incidents, but they may be generally categorized as follows:

1. Interruption by the prosecutor as defense counsel was interrogating witnesses, by commenting on the form of the question, or by laughing, or by talking to persons at the prosecutor's counsel table.

2. Responding to objections made by defense counsel sarcastically; as, "I guess he would object" or by statements as, "If [he] doesn't want the jury to hear the answer to that I withdraw it;" "Have you got something to hide?"

3. Making derisive remarks at witnesses, addressing one as "boy" and another as "granny" and cutting short adverse witnesses' answers on cross-examination.

4. Belittling the defense attorney by remarks that he was misquoting the evidence; that if he would come to court occasionally he would know the routine; and in one instance, after asking a witness if he had gone over his testimony with the defense counsel to which the witness replied he had not, and defense counsel stated this was true, demanding that defense counsel be put under oath.

5. Accusations categorizing a defense witness' testimony as a "cock and bull" story; attacking the defendant's testimony by remarks such as, "[T]his is a dead man he is talking about who can't come in and deny;" "You think . . . it is the way you can lie yourself out of it?"; "[Y]ou won't lie under oath but will when you are not . . . ."

6. Injecting collateral and inflammatory issues by stating to a female witness that she was familiar that the defendant had a lot of guns, and also asking the defendant, who was married, whether he had offered $3,000 to another woman to run away with him.

This Court has uniformly held that a prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. In keeping with this position, he is required to avoid the role of a partisan, eager to convict, and must deal fairly with the accused as well as the other participants in the trial. It is the prosecutor's duty

to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law. *State v. Britton*, ____ W. Va. ____, 203 S.E.2d 462 (1974); *State v. Hamric*, 151 W. Va. 1, 151 S.E.2d 252 (1966); *State v. Seckman*, 124 W. Va. 740, 22 S.E.2d 374 (1942); *State v. Summerville*, 112 W. Va. 398, 164 S.E. 508 (1932); *State v. Hively*, 103 W. Va. 237, 136 S.E. 862 (1927).

As a corollary to this rule, the Court has also recognized that the standard of fair and impartial presentation required of the prosecutor may become more elevated when the offense charged is of a serious or revolting nature, as it is recognized that a jury in this type of case may be more easily inflamed against the defendant by the very nature of the crime charged. Thus, in *State v. Seckman, supra,* this Court stated:

> "The crime of which this defendant is accused is 'so revolting that it is difficult for the average jury to give the one accused the benefit of a reasonable doubt'. *State v. Gill, supra; State v. Graham, supra,* 91. Its very nature should have prompted the prosecuting attorney to exercise the highest degree of decorum in the conduct of the trial." 124 W. Va. at 744, 22 S.E.2d at 376.

Defendant Boyd was charged with the most serious crime that can be brought under our criminal law, that of murder. It was therefore incumbent upon the prosecuting attorney to exercise the highest degree of decorum in the conduct of the trial, and this he did not do. By not so doing, the cumulative effect constitutes reversible error.

The third assignment of error rests on the fact that during the closing argument by defense counsel an objection was made by the prosecutor. The record reveals that the court, in considering the objection, invited counsel into chambers. The defendant was not present, no record was made of the proceedings, and consequently defendant claims that his rights under Article III,

Section 14 of the West Virginia Constitution, and W. Va. Code, 62-3-2, were violated.

The latest decision by this Court on the right of a defendant to be present during trial proceedings, *State ex rel. Grob v. Blair,* \_\_\_ W. Va. \_\_\_, 214 S.E.2d 330 (1975), discussed in considerable depth the nature and the history of the right. The Court concluded that it arises from two sources, one constitutional, one statutory. *West Virginia Constitution,* Article III, Section 14; W. Va. Code, 62-3-2.

*Grob* recognized that the right of presence, whether emanating from the Constitution or from statute, is subject to the doctrine of harmless error. Because a constitutional right was involved in that case, the test was stated to be "... whether the apparent error did not, beyond a reasonable doubt, prejudice the accused at trial." \_\_\_ W. Va. at \_\_\_; 214 S.E.2d at 337. As authority for this standard, *State v. Thomas, supra,* was cited, where the same rule was expressed as "... that the conviction must fall unless it can be shown that the error was harmless beyond a reasonable doubt." \_\_\_ W. Va. at \_\_\_, 203 S.E.2d at 461. *Thomas* cited *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), as precedent for the rule of harmless constitutional error.

Neither *Grob* nor *Thomas* explicitly stated that the doctrine of harmless error applies to a constitutional right guaranteed by the West Virginia Constitution, but that is the import of these decisions.

The Court in *Grob,* after correctly stating the doctrine of harmless error in regard to a constitutional right, as it had been formulated in *Thomas, supra,* restated the rule in different language and, in so doing, a shift in emphasis may have occurred.

Instead of the State having to show that the alleged error was harmless beyond a reasonable doubt, it was stated that the defendant "must demonstrate a possibility of prejudice." \_\_\_ W. Va. at \_\_\_; 214 S.E.2d at 337.

Perhaps this is only a subtle distinction, but it seems to us that it would be better to re-establish the rule in its original form.

Set in the original language of *Thomas* and *Chapman*, we hold that where the State defends against the claim that a right guaranteed by our Constitution has been violated, on the basis that the violation is harmless error, it is incumbent on the State to show that the error was harmless beyond a reasonable doubt.

*Grob* brought a new dimension into the accused's right of confrontation and presence which was to extend the same to "... any 'critical stage in *criminal proceeding*.' " However, when this principle was embodied in the 8th syllabus point of *Grob*, the words "... critical stage of the *trial proceeding* ..." were used. [Italics added.] A reading of *Grob* demonstrates that this syllabus language was not intended, since in the initial statement of this principle based on prior decision, the Court defined the scope of the right of presence:

> "From the prospective of the common-law/statutory right of presence, the presence of the accused is required at all stages of a felony trial, from arraignment to final judgment." ___ W. Va. ___; 214 S.E.2d at 338.

If the Court had concluded that it wanted to limit this right to a "critical stage" of the trial proceeding, as indicated in the syllabus, this would have been the place to have so stated. Rather, it continued on citing older cases dealing with the extent of the right of presence, and concluded with the expanded rule stating:

> "On the basis of more recent decisions of this Court, recognizing the due process test applied by the Supreme Court of the United States, we will now accord the right to the accused at any 'critical stage in the criminal proceeding.' *See,* e.g., syllabus point 3., *Spaulding v. Warden, supra.*" *Grob,* ___ W. Va. at ___; 214 S.E.2d at 338.

In order to clear up any ambiguity that exists between the holding in the opinion and the 8th syllabus

point of *Grob,* it is now reaffirmed that the right of the accused to be present follows any critical stage in the criminal proceeding.[6]

*Grob* did not define the test for a critical stage, except to cite *Spaulding v. Warden,* ____ W. Va. ____, 212 S.E.2d 619 (1975), which in turn relied upon *Coleman v. Alabama,* 399 U.S. 1, 26 L. Ed. 2d 387, 90 S. Ct. 1999 (1969). *Coleman* involved the right to counsel at a critical stage under the 6th Amendment to the United States Constitution, and not on the accused's right to confrontation under the 6th Amendment, although there appears to be a definite correlation between these rights. In *Faretta v. California,* 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), it was stated: ". . . that the Confrontation Clause of the 6th Amendment gives the accused a right to be present at all stages of the proceedings where fundamental fairness might be thwarted by his absence." *Faretta* based its statement on *Snyder v. Massachusetts,* 291 U.S. 97, 78 L. Ed. 674, 54 S. Ct. 330 (1934), where the Court reasoned that presence of the defendant was essential in order to assist his counsel.

We conclude that a critical stage in the criminal proceeding is one where the defendant's right to a fair trial will be affected. Certainly, *Spaulding v. Warden, supra,* teaches that if a preliminary hearing is held, it is a critical stage. Pre-trial hearings involving substantial matters of law or the testimony of witnesses would be deemed critical. Entry of routine orders filing motions or court orders involving clerical or administrative matters in connection with the criminal proceeding do not require the presence of the accused. Likewise, consultation between defense counsel, the prosecutor and the court prior to the actual trial are not deemed a critical stage. Because of the impact of the right to a speedy trial, matters surrounding a continuance should require the presence of the defendant. Generally, all matters start-

---

[6] *Grob* did not finally determine whether the constitutional right of confrontation was co-extensive with the statutory right of presence. We conclude they are the same in scope.

ing with the commencement of the actual trial require the presence of the accused through final judgment.

However, the critical stage requirement is, as noted in *Grob,* subject to the harmless error test. Consequently, there are two defenses available when it is claimed that the accused's absence creates reversible error. The first is that the absence occurred at a non-critical stage of the criminal proceeding. The second is that even if at a critical stage, it was harmless error.

Turning to the facts of the present case, the record indicates the defendant's absence was at a hearing in the judge's chambers after objection was made to the defense attorney's remarks to the jury in the middle of his closing argument. This hearing occurred during the trial and is a critical stage in the criminal proceeding. No record was made as to what transpired at the hearing. The State urges that no prejudice can be inferred, but the lack of a record makes a judgment on this point a guess. Even under the possibility of prejudice test for harmless error, which was used in *Grob,* the lack of a record would create the possibility of prejudice. Under the test for harmless constitutional error cited in *State v. Thomas, supra,* and *Spaulding v. Warden, supra,* which we have adopted, the State lacking a record cannot prove beyond a reasonable doubt that the defendant's absence was harmless.

If the State is to avoid the consequence of the rule requiring the presence of the accused at all critical stages of the criminal proceeding upon the doctrine of harmless error, it must take the responsibility of preserving a record of such critical stage, in order that it can be shown beyond a reasonable doubt the harmlessness of the defendant's absence.

For the foregoing reasons, this conviction is set aside and the case is remanded for a new trial.

*Reversed, remanded,*
*new trial awarded.*